IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 4:14-CV-219-FL

| | |
|---|---|
| JOHN RICHARD LAMM, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) ORDER |
| BRANCH BANKING AND TRUST COMPANY, and SCOTT P. EVANS, | ) |
| Defendants. | ) |

This matter is before the court on defendants' motion for judicial notice (DE-59) and motion for summary judgment (DE-36). Plaintiff responded in opposition and defendants replied. In this posture, the issues raised are ripe for ruling. For the following reasons, the court grants defendants' motion for summary judgment and denies as moot the motion for judicial notice.

**STATEMENT OF THE CASE**

On October 16, 2014, plaintiff filed a complaint in North Carolina State court against defendant Branch Banking and Trust Company ("BB&T"), defendant Scott P. Evans ("Evans"), and former defendant Michael P. Southern ("Southern"). (DE 1-2). The complaint advanced six claims for relief: (1) tortious interference with contract; (2) tortious interference with economic relations and prospective economic relations; (3) civil conspiracy; (4) wrongful attachment; (5) malicious prosecution; and (6) negligent hiring, supervision, and retention. (Id.).

On November 25, 2014, the case was removed to this Court, where former defendant United States of America was substituted for former defendant Southern. (DE 1). On December 19, 2014,

plaintiff voluntarily dismissed the claim against former defendant United States. (DE 4, 18). Defendants filed an answer to the complaint on January 12, 2015, to which plaintiff responded on March 27, 2015. (DE 19, 24).

On November 19, 2015, defendants filed the instant motion for summary judgment. (DE 36). In support of the instant motion, defendants rely upon internal BB&T documentation relating to plaintiff's termination, including emails, memos, interview notes (DE 37-1, -2); documents from the government investigations of plaintiff, including emails, memos, interview notes, and a seizure warrant (Id.); depositions of defendant Evans (DE 37-3, 46-1), plaintiff (DE 37-4, 46-2), Russell "Danny" Daniels ("Daniels") (DE 37-5), Michele Greene ("Greene") (DE 37-6), Sandra Blanton ("Blanton") (DE 37-7), and Christopher Bennett ("Bennett") (DE 37-8); declarations by Bennett (DE 47), Greene (DE 48), Southern (DE 49), Wanda Inman ("Inman") (DE 50, 50-1; 50-2), and defendant Evans (DE 51).

Plaintiff responded on December 14, 2015, relying upon a declaration by plaintiff (DE 45-3); plaintiff's interrogatory responses (DE 45-4); internal BB&T documentation, including ethics investigation forms, memos, emails and performance reviews (DE 45 -5, -6); documentation from the government investigations against plaintiff, including a warrant, affidavit, settlement agreement, and emails (DE 45-6); depositions by plaintiff (DE 45-7), Bennett (DE 45-8), Candace Beverly ("Beverly") (DE 45-9), Daniels (DE 45-10), defendant Evans (DE 45-11), Lisa Golterman ("Golterman") (DE 45-12), and Greene (DE 45-13).

Defendants thereafter filed the instant motion on April 6, 2016, asking the court to take judicial notice of an ongoing action, to which plaintiff filed a response in opposition on April 20, 2016. (DE 59).

2

## STATEMENT OF FACTS

The facts viewed in the light most favorable to plaintiff are as follows:

Defendant BB&T is a national bank, ranked tenth in the county by assets. Evans Dep. (DE 45-9 at 5). Plaintiff worked for defendant BB&T as a corporate banker for approximately 27 years. Lamm Dep. (DE 45-6 at 118). In his role as a corporate banker, plaintiff was responsible for opening loans. (Id. at 6-7). BB&T utilized an "incentive matrix" that provided different incentives that varied on whether an account was "new," meaning the money in the account came from a non-BB&T bank, how fully utilized the account was, and what sort of business the account was used for. (DE 37-1 at 6); Bennett Dep. (DE 46-8 at 3-4). BB&T used "MI-458" forms to detail loan production for incentive credit. Evans memo (DE 37-1 at 6). For nine years of plaintiff's employment at BB&T, plaintiff was supervised by Daniels, who awarded plaintiff high marks for performance. Daniels Dep. (DE 45-8 at 21-26).

Daniels retired, and was replaced as plaintiff's supervisor by defendant Evans in January 2011. Evans Dep. (DE 37-3 at 3). At this time, plaintiff was based in Greenville, North Carolina, but frequently traveled to other cities for business. Lamm Dep. (DE 45-6 at 5-6). In January 2011, plaintiff applied for a city executive position within BB&T. In March 2011, plaintiff learned that it had been awarded to somebody else, and spoke to defendant Evans about finding another position within the bank; defendant Evans did not object, but also did not offer support for this move. Lamm Decl. (DE 39-2 at 1); Lamm Dep. (DE 45-6 at 88).

Plaintiff asserts that after March 2011, defendant Evans took a negative approach to dealing with plaintiff. Lamm Dep. (DE 45-6 at 88). Plaintiff specifically points to a meeting with defendant Evans and a customer in which "it was a question asked in a meeting, and I had a solution

3

to the problem, and instead of adding to my solution . . . it was pretty much kind of a – I took it as a scolding, that my answer was incorrect. And, then, he gave a different answer." Lamm Dep. (DE 45-6 at 88-89).

On September 2, 2011, defendant Evans met with plaintiff to review his performance for the first half of the year. Defendant Evans spoke in a raised tone of voice and castigated plaintiff regarding his performance. Lamm Dep. (DE 45-6 at 8). As the basis for the negative performance review, defendant Evans asserts that he used complaints from one or more of plaintiff's coworkers relating to plaintiff's attendance, his personal observations, concerns from BB&T clients to whom plaintiff was assigned, and plaintiff's poor performance on BB&T's "balance performance" metric. Evans Memo (DE 37-1 at 3-4.). While defendant Evans had previously received information that plaintiff had inappropriately managed his incentive matrix, he did not discuss this allegation to plaintiff during the September 2, 2011 meeting. (Id.).

Defendant Evans reported that on September 6, 2011, he noticed a $5.202 million deposit from United Healthcare Consortium ("UHC"), and asked Donna Astle ("Astle"), BB&T's Senior Vice President and Deposit Portfolio Administrator, about it. (Id.). Astle sent an email the same day stating that it was coded as "new" money, and on September 8, 2011, followed up with Nola Overton ("Overton") who keyed in the account. Astle Emails (37-1 at 35, 36). Overton informed Astle that she had coded it as new money at plaintiff's request, and that she "NEVER SAW THE CHECK [plaintiff] TOOK . . . TO THE TELLER LINE." (Id.). This email was cc'd to plaintiff. (Id.).

Plaintiff asserts that he took the check to Overton, who would have needed it to open the account, and that she accidentally keyed it as "new," which he was unaware of at the time, though

4

he "may have helped her . . . fill out the deposit slip" and "may very well have carried it to the teller window." Lamm Dep. (DE 45-7 at 28-30). Plaintiff asserts both that he didn't "recall specific conversations" with Overton regarding those funds, and that he had a conversation with her in which she confessed to making a mistake regarding how she coded the deposit, and told her that he would take the blame for the incident. Lamm Dep. (DE 45-6 at 26, 31). On September 9, 2011, Astle was contacted up by plaintiff, who told her that "it is not new money, and that is my fault" and that it was a "[mis]communication." Lamm Case Summary, Phone Tr. (DE 37-1 at 38).

Subsequent to this incident, defendant Evans spoke to Blanton, an HR manager, and "they agreed to file a 'Suspicious Incident Report'" ("SIR"). Evans Memo (DE 37-1 at 5). The SIR filing triggered an HR investigation by Inman, which was coordinated with a fraud investigation conducted by Greene. Inman emails, SIR documentation (DE 37-1 at 19-23).

On September 19, 2011, Greene discussed the SIR with defendant Evans, who addressed the incident, informed her of his suspicions, and referred her to Tommy Price, Goltermann, Beverly, and Kristen Ray. (Id.). Greene interviewed these individuals, as well as Overton and plaintiff over a period lasting until October 13, 2011, and reviewed seven client accounts. (Id.).

On October 17, 2011, defendant Evans met with Greene and Inman to discuss their findings. Evans Memo (DE 37-1 at 5-6). Greene noted that she had found several instances where plaintiff had issued a new note, rather than a note modification, which would allow the note to appear on the "new loan production report" for incentives. Evans Memo (DE 37-1 at 6).

On October 18, 2011, defendant Evans requested and reviewed MI-458 forms completed by plaintiff, which detailed his loan production for incentive credit for 2009 and 2010. (Id.). Defendant Evans reported to Greene and Inman that these forms showed multiple falsifications. (Id.)

5

Defendant Evans reported that in 2009, plaintiff estimated 100% utilization for a "rarely used" $11 million line of credit, and then, in 2010, estimated 100% utilization in "new production credit" for the same line of credit. (Id.). Defendant Evans also reported eight other loans in 2010 for which plaintiff also claimed excessive credit. (Id.).

On October 19, 2011, Greene interviewed plaintiff, with Inman as a witness. (Id. at 40). Greene first asked plaintiff about expensing irregularities, and then asked about the $5.202 million filed as "new money." Plaintiff stated "it was a mistake, and he had taken care of it." (Id.). Plaintiff was then asked about the discrepancies in the 2009 and 2010 MI-458 forms, and he stated that he "used his best judgment," and referred Greene to his former supervisor, Daniels. (Id.). Greene then asked plaintiff to provide a written statement explaining his actions. (Id.). Plaintiff stated he felt sick, and left. (Id.).

On October 20, 2011, defendant Evans recommended termination. (Id.). HR supported this recommendation, for the reason that plaintiff had "falsified his incentive compensation information dating back to at least 2009." Evans Memo (DE 37-1 at 7). Defendant Evans subsequently informed plaintiff of his termination. (Id.). The ongoing investigation by Greene estimated overpayment to payment resulting from incentive falsification at $323,595.00. (DE 37-1 at 41). The BB&T's corporate investigations referred the matter to former defendant Southern, a special agent with the Secret Service, and Brian McCarthy, an investigator with the Federal Deposit Insurance Corporation (FDIC). (Id.).

On October 27, 2011, defendant Evans spoke with UHS to discuss the $5.202 million deposit. Evans Memo (DE 37-1 at 8-9). At that meeting, the UHS representative asked about

6

certain representations made by plaintiff, and defendant Evans told her that plaintiff had been "utilizing our 'sales campaign for his benefit.'" (Id.).

The United States applied for a seizure warrant, supported by special agent Southern's affidavit, which incorporated BB&T's corporate investigation. Lamm Case Summary (DE 37-1 at 44). The United States then used the warrant to seize $323,595.00 from plaintiff in a civil asset forfeiture action. The parties settled, with plaintiff receiving $69,358.22 of the seized assets, and the United States receiving $254,236.78 of the assets, which were transferred to defendant BB&T. (DE 32, 33).

The FDIC also instituted an action on a similar basis, for the remaining $69,358.22 in seized assets. This case is currently ongoing. FDIC Letter (DE 37-2 at 18).[1]

In January 2012, plaintiff was hired at Select Bank & Trust ("Select Bank") as a business loan officer. Pl. Interrog. Resp. (DE 45-4 at 3). In May 2012, plaintiff resigned after the FDIC informed plaintiff that they were pursuing an administrative action to enjoin him from working at any federally insured deposit corporation. (Id.). Plaintiff later interviewed at Trust Atlantic Bank, but did not receive a position. (Id. at 3-4).

---

[1] Rule 201 of the Federal Rules of Evidence permits the court to judicially notice a fact that is not subject to reasonable dispute "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.
 Defendants ask this court to judicially notice the fact that the FDIC has instituted an administrative enforcement action against plaintiff based on facts and circumstances which are the subject of this judicial action. The FDIC proceeding is discussed by plaintiff in his deposition. (DE 45-4 at 74-78). The fact that the FDIC has instituted such an enforcement action can be accurately and readily determined from sources, such as FDIC filings, whose accuracy cannot reasonably be questioned. However, plaintiff does not dispute the existence of the FDIC proceeding, or that it originated with disclosures from defendants, and it is not otherwise necessary in determining the disposition of the claims on summary judgment. Accordingly, the motion is denied as moot.

7

**DISCUSSION**

A.  Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, a pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). In evaluating whether a counterclaim is stated, "a court accepts all well-pled facts as true and construes these facts in the light most favorable" to the claimant, but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Nor must the court accept "unwarranted inferences, unreasonable conclusions, or arguments." Id.

B.  Analysis

    1.    Claim One: Tortious Interference with Contract

Plaintiff claims that defendant Evans tortiuously interfered with plaintiff's employment contract with BB&T by "knowingly making false accusations" with malice that resulted in the termination of plaintiff's employment contract. (DE 1-2 at 20). The North Carolina Supreme Court has recognized a claim under North Carolina law based upon tortious interference with contract, comprised of the following elements:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the

8

contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498 (1992).

Interference is always considered justified when a "non-outsider" interferes with a contract to protect a legitimate business interest. See Smith v. Ford Motor Co., 289 N.C. 71, 87-88 (1976). Non-outsiders are third parties who nevertheless have a legitimate interest in the subject matter of the contract. Id. A non-outsider has qualified immunity for actions taken in furtherance of their legitimate business interest in the subject matter of the contract. Id. However, "[i]f the non-outsider's actions are not the result of a legitimate business interest, but rather the result of a malicious purpose or motive, then the interference with the contract is actionable." B.V.I. Indus, Inc. v. Microsoft Corp., 826 F.2d 1059, 1987 W: 38488 at *3 (4th Cir. Aug. 11, 1987), (citing Ford Motor Co., 289 N.C. 87-88).

However, "it is not enough to show that a defendant acted with actual malice; the plaintiff must forecast evidence that the defendant acted with legal malice." Varner v Bryan, 113 N.C. 697, 702 (1994). "Here, malice means intentionally doing a wrongful act or exceeding one's legal right or authority in order to prevent the making of a contract between two parties." Murphy v. McIntyre, 69 N.C. App. 323, 328 (1984). Where the complained of actions are within the scope of authority, they are not legally malicious. Id.; see also Childress v. Abeles, 240 N.C. 667, 675 (1954) ("If an outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be"). Under a standard of legal malice, "even if plaintiff was terminated by defendants for personal or political reasons" such a termination was not legally malicious where "not a wrongful act or in excess of defendants' authority." Varner, 113 N.C. at 702.

9

Plaintiff argues that non-outsider status can be defeated by simply showing "hostility and illwill," the language in Murphy v. McIntyre, Varner, and Childress notwithstanding. In support of this proposition, plaintiff cites Barker v. Kimberly-Clark Corp., 136 N.C. App. 455 (2000), and Combs v. City Electric Supply Co., N.C. App. 75 at 83-84 (2010). In Barker, the plaintiff showed not only that her accuser had a "hit list" of employees he wished to fire, but that he made actually defamatory statements that led to her unemployment. 136 N.C. at 455. In Combs, the plaintiff's assertions that defendant falsified a performance review was "buttressed by two witnesses," who provided testimony conflicting with the report, that the defendant had put the plaintiff on a "hit list" and had been going through the plaintiff's office and paperwork in the plaintiff's absence. While these cases do contain dicta stating a showing of "hostility and illwill" is sufficient, the facts in these cases nonetheless meet the standards of legal malice as articulated in Murphy, as they don't merely show hostility, but actual wrongful acts.

In other cases where the North Carolina Court of Appeals has found legal malice, defendants did not simply act through legal channels with an impure motive, but took measures beyond the scope of their authority, such as actively spreading defamatory information, falsely accusing plaintiff, withholding information, or otherwise injuring plaintiff. See Bloch v. The Paul Rever Life Ins. Co., 143 N.C.App. 28 (2001); Lenzer v. Flaherty, 106 N.C.App. 496 (1992). In Bloch, defendants not only continuously discussed their desire to end plaintiff's employment, but plaintiff was able to demonstrate that they illicitly obtained information about him, prevented information intended for him from reaching him, and otherwise directly interfered with both his performance and the perception of his performance. Bloch 143 N.C.228. In Lenzer, evidence was introduced demonstrating that both of the defendants openly expressed a desire for the plaintiff to be fired, and

10

then refused to provide supervisory support to cause her to lose her certification, and, ultimately, her employment. 106 N.C.App. 496 at 512-513.

Here, the only element of tortious interference claim under dispute is whether defendant Evans acted "without justification" in causing plaintiff to be fired. Plaintiff concedes that, as plaintiff's supervisor, defendant Evans was a non-outsider to plaintiff's employment contract. Pl. Resp. (DE 45 at 19). Thus, the court turns to the question of whether defendant Evans acted in furtherance of a legitimate business interest, or whether he acted out of malice.

Plaintiff makes a myriad of assertions in order to prove malice. First, plaintiff asserts that malice is shown because defendant Evans should have been aware that the reports on which he based his decision required the approval of plaintiff's supervisor, and that defendant Evans "manipulated" the investigation "by allowing them to believe that Lamm had acted without his supervisor's permission." Pl. Resp. (DE 45 at 20-21). Second, plaintiff points to "negative treatment," wherein defendant Evans was "belligerent and unprofessional", specifically when plaintiff was corrected in front of a client, and when plaintiff was loudly reprimanded at length. (Id. at 21). Third, plaintiff asserts that a reasonable jury could find that said behavior was unreasonably based on unsubstantiated rumors, and that this demonstrates malice. Fourth, plaintiff asserts that malice is shown because defendant Evans did not contact plaintiff regarding the UHS transaction prior to launching a SIR, especially given plaintiff's proffered explanation. Fifth, plaintiff refers to defendants "persistence" in the investigation, specifically referring to the October 18, 2011 email. Sixth, plaintiff asserts that malice can be imputed because, a week after plaintiff was fired, defendant

11

Evans "defamed" plaintiff by informing plaintiff's former client that plaintiff had been using BB&T's sales campaign for "his personal benefit." (Id. at 21-22).[2]

Most of these claims, even if supported by evidence, do not show "legal malice" as used by the North Carolina Court of Appeals. See 69 N.C. App. at 328. Defendant Evans' correction of plaintiff, beratement of plaintiff for failing to meet his performance requirements, participation in and initiation of an investigation against plaintiff, all fall solidly within Defendant Evans' legal authority in his role as plaintiff's supervisor. Contrary to plaintiff's assertion, he was not upbraided on rumors from one source alone, but also on his poor balance performance metric and defendant Evans' personal observations. Evans memo (DE 37-1 at 3-4). Likewise, defendant Evans' participation in the investigation he initiated appears to arise from discrepancies in the documents he found, which plaintiff has admitted overstated his loan production. Lamm. Dep. (DE 45-4 at 51). Interpreting the facts in the light most favorable to plaintiff would merely show that defendant Evans was mistaken, not acting with malice. Defendant Evans was not obligated to take plaintiff's proffered reasons for the discrepancies at face value, and his failure to do so cannot be termed malicious absent evidence he knew plaintiff's explanations to be true.

Plaintiff does, however, refer to two acts that, if supported by evidence, could be wrongful acts showing legal malice.

First, plaintiff asserts that defendant manipulated the investigation against him by intentionally withholding crucial information from Greene's and Inman's investigations. Defendant Evans' malice is proven, plaintiff asserts, by his failure to inform Greene and Inman that the 2009

---

[2] While plaintiff does not suggest it as a basis for malice while discussing the claim for tortious interference, plaintiff does make reference in his factual summary to an event in which defendant Evans came to plaintiff's home. The visit was undertaken with another BB&T employee to retrieve BB&T property from plaintiff. (DE 36-1 at 7-8).

12

Case 4:14-cv-00219-FL   Document 63   Filed 07/25/16   Page 12 of 19

and 2010 MI-458 forms discussed on October 18, 2011, required the approval of plaintiff's former supervisor, Daniels, which plaintiff asserts defendant Evans knew was necessary, "because Daniels' signature was on the reports." Pl. Resp. (DE 46 at 21). Plaintiff asserts that Daniels had instructed him to fill out the forms in a manner which did not reflect plaintiff's actual loan production, but instead to "max out this MI-458 report with the maximum utilization and not counting any refinances." Lamm Dep. (DE 45-7 at 50-51, 66-69).

While manipulation of an investigation could be evidence of malice, the evidence proferred by plaintiff is not evidence of manipulation by defendant Evans. Greene and Inman could have seen Daniels' signature, as they were provided with those very forms, shown by their possession of them when interviewing plaintiff the next day. Lamm Case Summary (DE 37-1 at 40). Moreover, assuming Daniels had instructed plaintiff on filling out the 2009 and 2010 MI-458 forms, this was immaterial to the reason defendant BB&T fired plaintiff. BB&T fired plaintiff for falsifying the MI-458 forms, and his assertions admit he intentionally filled them out with false information; that he did so following Daniels' instructions is immaterial to the basis of his firing. Lamm Dep. (DE 45-7 at 110-111); Termination Form (DE 37-1 at 2).

Second, plaintiff asserts that he was defamed when, after his termination, defendant Evans informed a UHS representative that plaintiff had been "using [BB&T]'s sales campaign for his own benefit." (DE 37-1 at 8-9). Plaintiff argues that such statement is defamatory because plaintiff did not receive a financial benefit from the UHS transaction. The court finds that a reasonable jury could not conclude that this was a defamatory statement. Simply because plaintiff did not ultimately receive a financial benefit does not make the statement defamatory. Plaintiff was, for some time, granted incentive credit from the transaction, and was unable to because the error was ultimately

13

corrected. While plaintiff asserts that he intended to correct this error, and would never have received such a benefit, defendant Evans is and was not obligated to accept his explanation as true.

In sum, as plaintiff has failed to forecast sufficient evidence showing defendant Evans acted with malice, the claim for tortious interference with contract necessarily fails.

2. Claim Two: Tortious Interference with Economic Relations and Prospective Economic Relations

The elements of tortious interference with prospective economic relations are the same as tortious interference with contract, except that, "in order for a plaintiff to be successful on a claim of tortious interference with prospective advantage, plaintiff must show that [d]efendants induced a third party to refrain from entering into a contract with [p]laintiff without justification," and "the contract would have ensued but for [d]efendants' interference." S.N.R. Mgmt. Corp. v. Danube Partners, 189 N.C.App. 601 at 615 (2008) (internal citations and quotations omitted).

Plaintiff asserts that defendant Evans tortiously interfered with plaintiff's prospective economic relations when defendant Evans submitted reports to the U.S. secret service, causing difficulties for plaintiff in seeking employment. Compl. (DE 1-2 at 22). The complaint asserts that the secret service received a report prepared by Evans, and that Evans informed them it was a document prepared by plaintiff. Compl. (Id.). This is not reflected by the record, as the report in question did not purport to be written by plaintiff. Affidavit and Warrant, (DE 37-1 at 24-31); Case Summary (DE 37-1 at 37-41).

As a threshold matter, because this claim requires the same showing that defendant acted "without justification" as the claim of tortious interference with contract, it fails for the same reasons. See supra.

14

Moreover, plaintiff's asserted lost prospective economic advantages are unavailing. First, plaintiff cannot rest a claim of interference with prospective economic advantage on his stock options or his position with Select Bank, as asserted in his brief. These were existing contracts, and cannot serve as the basis for a claim of tortious interference with prospective economic advantage. DaimlerChrysler Corp. v. Kirkhart, 148 N.C. 572 at 584 (2002). They are instead claims of tortious interference with contract, duplicative of the first claim, and must be denied for the same reasons. Second, to the extent they are unique claims, "the proper procedure for plaintiffs to assert a new claim is to amend the complaint" Gilmour v. Gates, McDonald and Co., 382 F.3d 1312 (11th Cir. 2004). Plaintiff "may not amend [his] complaint through argument in a brief opposing summary judgment." Id.

Second, plaintiff's assertions in his brief that the ongoing investigations prevented plaintiff from seeking out or obtaining any other positions are insufficient. To support a claim of tortious interference with prospective economic advantage, plaintiff must point to a specific opportunity with which defendant interfered. S.N.R. Mgmt. Corp., 189 N.C.App. at 615. Plaintiff does not assert the existence of any such future opportunity, nor is any reflected by the record. See Pl. Interrog. Resp. (DE 45-4 at 3).[3]

Finally, to the extent that plaintiff claims prospective interference with economic relations due to the defendants' report to the FDIC and secret service, federal law provides financial institutions and their employees with immunity from liability for such reports:

> (A) In general.--Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure

---

[3] Plaintiff's factual summary discusses defendant's failure to provide a recommendation for plaintiff in March 2011, but does not provide this as grounds for this claim. As inaction in the absence of a duty to act is hardly interference, this would also not support such a claim.

15

> pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

31 U.S.C. § 5318(g)(3)(A).

This safe harbor provision exempts member banks from liability, whether the report is required under the law or filed on a voluntary basis. See 12 C.F.R. § 208.62. "The safe harbor provision does not limit protection to disclosures based on a good faith belief that a violation has occurred." Lee v. Bankers Trust Co., 166 F.3d 540 at 546 (2nd Cir. 1999). The plain language of the provision is sweeping, "providing immunity from *any* law . . . for *any* statement made . . . by *anyone* connected to a financial institution," never once mentioning good faith. Id. (quoting 31 U.S.C. § 5318(g)(3)(A).). In addition, proving good faith in this context would frequently require disclosure of information that congress has prohibited the financial entities to disclose at all. Id. at 545-546; 12 C.F.R. § 208.20(k).

Plaintiff does not discuss the Act directly in his response, nor argue that the act does not apply to any of claims two, three, four, or five, or any other theory of law that would overcome this defense. Plaintiff does state defendant Evans "is not insulated from liability because of false or fraudulent statements to an investigator 'within the jurisdiction of any department of the United States.'" Pl. resp. (DE 45 at 24) (quoting 18 U.S.C. § 1001). The meaning of this sentence is not clear, but assuming it was meant to address the safe harbor provision, it does so ineptly, as plaintiff's explanation is vacuous and the statute quoted does not refer to 31 U.S.C. § 5318 specifically or

16

immunity generally. Therefore, claims two, three, four, and five, where premised on defendants' disclosures to the FDIC and SS, are barred by this provision and fail.

In sum, claim two fails as a matter of law, because plaintiff has failed to demonstrate that the acts were without justification, because plaintiff failed to assert *prospective* economic opportunities, with which defendants interfered, and because this claim is otherwise barred by immunity.

3.  Claims Three and Five: Civil Conspiracy, Malicious Prosecution

Plaintiff's briefing at summary judgment makes no mention of either of these claims, let alone defendant's arguments addressing them, and is therefore deemed to have conceded that summary judgment is appropriate as to claims three and five. See Feldman v. Law Enforcement Associates Corp. 955 F.Supp2d 528, 536 (E.D.N.C. June 28, 2013); Ferdinand-Davenport v. Children's Guild, 742 F.Supp.2d 772, 777 (D.Md. 2010); Klugel v. Small, 519 F.Supp.2d 66, 72 (D.D.C. 2007).

Therefore, claims three and five must fail.

4.  Claim Four: Wrongful Attachment

Claim four asserts that through their "statements before the U.S. District Court and to the U.S. Attorney's office, [d]efendants Evans and Southern caused an encumbrance of [p]laintiff's personal bank assets." Compl. (DE 1-2 at 26). Plaintiff's briefing instead refers to the documents and reports made by defendant Evans. (DE 45-1 at 25). As above, modification via briefing is not appropriate. In any case, in either of the versions plaintiff has presented, these disclosures are the sort protected by the safe harbor provision, in 31 U.S.C. § 5318, something plaintiff does not dispute.

This claim is therefore barred by the immunity enjoyed by defendants, and must fail.

17

5. Claim Six: Negligent Retention and Supervision

Under North Carolina Law, "to support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to the plaintiff, and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Robinson, Bradshaw, & Hinson, P.A. v. Smith, 129 N.C. App. 305, 318 (1998).

"An essential element of a claim for negligent retention of an employee is that the employee committed a tortious act resulting in plaintiffs' injuries." Waddle v. Sparks, 331 N.C. 73, 87 (1992). Where the tortious claims which the employee is alleged to have committed cannot go forwards, neither can the claim of negligent retention and supervision. As previously discussed, plaintiff's five other claims must be denied at summary judgment, accordingly, the claim of negligent retention and supervision likewise must fail as a matter of law.

Moreover, even if such a tortious act could be demonstrated, the second element of the tort requires plaintiff to show that, prior to the acts alleged, "the employer knew or had a reason to know of the employee's incompetency." Robinson, 129 N.C. App. 318.

Instead of putting forward any evidence of such knowledge on the part of defendant BB&T, plaintiff urges the court to utilize a test from medical malpractice cases. In these cases, an on-call defendant had an established duty to supervise resident physicians who were still in training, but failed to do so, and harm resulted. See Rouse v. Pitt County Memorial Hosp., Inc., 343 N.C. 186 (1996). Expanding the Robinson test to include these cases does not involve a substantive change: negligent supervision only exists if the supervisor knew or had reason to know of the incompetence of the supervised party, either from a prior action or due to trainee status. No such characteristic has

18

been identified by plaintiff. While plaintiff has asserted his prior positive record as such a basis, that is irrelevant to the question at hand. See, e.g., Barker 136 N.C.App. at 458, 465-466 ("plaintiff received 'good' annual written evaluations and numerous certificates of commendation" but the court limited their inquiry for negligent supervision to whether there was a pre-existing reason to doubt the competence of her supervisors). Nor do the bad acts plaintiff alleges defendant committed meet the requirements, as they are the tortious claims, and cannot occur prior to themselves.

In sum, plaintiff's claim of negligent retention and supervision does not meet the necessary elements and fails.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is GRANTED. (DE 35). The motion to take judicial notice is DENIED. (DE 59). The clerk is DIRECTED to close this case.

SO ORDERED this the 25th day of July, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge